IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE

# GERALD LARGEN  v.  CRACKER BARREL OLD COUNTRY STORE, INC.

**Direct Appeal from the Circuit Court for Roane County**
**No. 11476     Hon. Russell Simmons, Jr., Judge**

-----

**No. E1999-01006-COA-R3-CV - Decided  April 13,  2000**

This is a suit by Seller against Buyer for the Buyer's termination of the parties' contract for the sale of real property.  Appellee Cracker Barrel Old Country Store, Inc. ("Buyer") entered into a contract to purchase real property from Appellant Gerald Largen ("Seller") but terminated that contract three weeks later, after Buyer decided that the premises were unsatisfactory for its intended use.  Seller filed a "Complaint for Declaratory Judgment," later amended to allege that Buyer had breached the contract, for which Seller sought damages of $500,000.  Buyer answered that the termination of the contract and return of its earnest money deposit were done in accordance with the terms of the contract which provided certain conditions precedent to the sale.  The Trial Court found that Buyer had breached its covenant of good faith and fair dealing and awarded Seller $5,000 as liquidated damages as provided for in the contract.  Because we find the evidence preponderates against the Trial Court's finding that Buyer breached the contract, we reverse the judgment of the Trial Court and dismiss Seller's Complaint.

**Tenn. R. App. P. 3; Judgment of the Circuit Court is Reversed and the case is Remanded.**

SWINEY, J., delivered the opinion of the court, in which GODDARD, P.J, and SUSANO, J., joined.

Gerald Largen, Kingston, Tennessee, Pro Se

John D. Agee, Kingston, Tennessee, for the Appellee, Cracker Barrel Old Country Store, Inc.

# OPINION

### Background

A realtor contacted Seller in July or August 1996 and asked him whether he would be willing to sell a 2.5 acre tract of land at the intersection of U.S. Highway 27 and Interstate Highway 40 in Roane County.   The realtor then arranged a meeting between Seller and Buyer's representative, Tom Reddy, on October 9, 1996.   Buyer brought a sales contract to the meeting.  Seller, an attorney licensed in Tennessee for over forty years, reviewed the contract and advised Buyer that he could not sign it unless some changes were made.  Buyer agreed to make those changes. On October 24, 1996, the parties met again and Buyer delivered to Seller the proposed

final draft of the contract. Seller studied the contract and signed it in Buyer's presence. Reddy sent the signed contract to company vice-president, Donald Cravitts, who signed it on behalf of Buyer on October 30, 1996. We reproduce two paragraphs of the contract which are at issue in this appeal:

> **4. Earnest Money.** Purchaser shall deposit with Chicago Title Insurance Company, as escrow agent, Five thousand and no/100 Dollars ($5,000.00), as earnest money, within ten (10) days after the last execution of this Agreement, to be held in escrow agent's interest bearing trust account and to be credited against the purchase price at closing (said earnest money, and any and all interest accrued thereon, hereinafter collectively called the "Deposit"). Purchaser shall deposit the balance of the purchase price in escrow with said escrow agent within ten (10 days) after the title has been approved by Purchaser, all contingencies of this Agreement have been met, and a deed as aforesaid has been delivered to the escrow agent. If Purchaser defaults hereunder and fails to cure said default within thirty (30) days after receipt of written notice therefor from Seller, then, upon demand of Seller, said Deposit shall be forfeited as liquidated damages and this Agreement shall become null and void. It is specifically agreed that Seller's sole remedy in the event of a default by Purchaser under this Agreement shall be limited solely to retention of the Deposit as liquidated damages, and Seller waives any and all other damages and causes of action which may have arisen pursuant to law, including without limitation, any right to specific performance, or under any other terms of this Agreement. If this Agreement is terminated for any reason other than Purchaser's default, the Deposit, together with any other sums and/or documents deposited with the escrow agent by Purchaser, shall be returned to the Purchaser.

> \* \* \*

> **6. Conditions Precedent:** Seller hereby acknowledges that Purchaser would be unable to use the Premises for purposes other than a Cracker Barrel Old Country Store® constructed according to the Purchaser's plans and specifications, together with curb cuts and off-street parking and signage acceptable to Purchaser, including without limitation, Purchaser's identification pole sign, building sign and directional/entrance-exit signs (collectively, "Purchaser's Intended Use"). Therefore, this purchase and sale is subject to the satisfaction of the following conditions and covenants:

> \* \* \*

D.   Purchaser obtaining a . . . certified survey satisfactory to Purchaser, in its sole opinion . . . not disclosing any condition rendering the Premises unusable, **in Purchaser's sole opinion,** for Purchaser's Intended Use.

E.   Purchaser obtaining, at Purchaser's expense, boring, percolation and other soil tests ("Soil Tests"), as well as environmental, structural and physical inspections/assessments ("Physical Inspections"), and feasibility, demographic, traffic pattern, labor pool and other site assessment studies ("Site Studies") **showing that the Premises is satisfactory, in Purchaser's sole judgment, for Purchaser's Intended Use.**

*   *   *

F.   Purchaser obtaining ingress and egress to public thoroughfares adequate, **in Purchaser's sole opinion,** for Purchaser's Intended Use under terms and conditions acceptable to Purchaser, **in its sole discretion.**

(Emphasis added.)

In the event the conditions of this Agreement have not been satisfied or complied with within one hundred eighty (180) days after the Effective Date (ninety (90) days with respect to senior management approval), or in the event that the Soil Tests, Physical Inspections, Site Studies, surveys, Governmental Approvals, permits, approval of Purchaser's senior management and/or other approvals have not been obtained within said one hundred eighty (180) day period (ninety (90) days for senior management approval), or do not meet with Purchaser's approval or disclose matters which would make the Premises unsuitable for the purposes stated herein, anything contained herein to the contrary notwithstanding, Purchaser may, at its option and at any time after the aforementioned one hundred eighty (180) day period (ninety (90) day period for senior management approval), terminate this Agreement, and the money and documents deposited in escrow shall be returned to the party depositing same.

On November 20, 1996, three weeks after the contract was signed, Buyer sent a letter to Seller which we reproduce:

Dear Mr. Largen:

We regret to inform you that in the course of conducting the various

-3-

conditions precedent set forth in Article 6E of the Real Estate Sales Contract dated October 30, 1996, Cracker Barrel has determined that the Premises is unsatisfactory for Purchaser's Intended Use (as defined in the Contract). Therefore, this letter shall constitute official notice to you under Article 6 of the Contract that Cracker Barrel has elected to terminate the Contract and obtain the return of its earnest money deposit.

By carbon copy hereof to Chicago Title Insurance Company, we are hereby requesting the return of the earnest money Deposit for the transaction.

We regret that this action is necessary and hope that future transactions will be more fruitful.

Sincerely,

S. James Torcivia
Director, Real Estate

Seller testified at trial that he went over the proposed contract with Tom Reddy, Buyer's representative, and "had considerable discussion" with Reddy about the contract. They discussed the existence of an easement for ingress and egress on adjacent Shoney's property. Seller told Buyer that he was concerned about provisions in the contract requiring Seller to bear expense of studies, survey and other things that Seller was unwilling to bear. Buyer agreed to strike the offending portions of the contract. A second draft was delivered to Seller on October 24, 1996, Seller studied it and signed it. Buyer signed the contract on October 30, 1996. That same day, Seller signed an authorization for Buyer to go on the land for purposes of "surveying and so on."

Seller testified that he had no further contact with Buyer until November 24, 1996, when he received a letter from Buyer saying that it had terminated the contract under the provisions of section six of the contract. Seller then wrote Buyer on November 26 and December 17, 1996, asking for "some explanation" and "further information." Counsel for Buyer responded that the termination had been accomplished in accordance with the terms of the contract.

Seller testified that he then wrote to Chicago Title and Insurance Company on January 15, 1997, asking if they were still holding the $5,000 deposit in escrow. The title company replied that the deposit had been refunded to Buyer. Seller then filed suit for declaratory judgment, later amended to allege breach of contract "as a result of the production of documents from the defendant." Seller testified that he had calculated his damages as $490,200.[1]

---

[1] The original contract provided $278,000 purchase price , with $27,800 of that being for real estate broker's commission and $250,000 being Seller's share. The contract was for two and

-4-

On cross-examination, Seller admitted that an adjacent restaurant, Shoney's, had placed a sign in the easement appurtenant to his property. He also admitted that he learned during pre-trial discovery that Buyer had performed some investigations to determine the fitness of the property for its intended purpose before terminating the contract. Those investigations included the hiring of an outside engineering firm to estimate the cost of the project and to prepare a preliminary plot plan showing the contemplated building, parking and signage.

Seller admitted that he also learned during discovery that Buyer performed its own internal site development cost estimates prior to terminating the contract and that the in-house estimator had opined that site development costs would be $600,000 higher than the outside engineering firm had estimated. The difference in the two estimates was due to the in-house estimator adding $600,000 for the cost of removing rock from the property. The presence or absence of rock on the property is the major factual dispute between the parties. Seller insisted that Buyer's cost estimate was wrong because there was no rock on his property, and since there was no rock, Buyer was incorrect in claiming that there would be $600,000 of additional costs for removing rock. Seller contends that without that $600,000 addition to the cost estimate, the project would have been economically feasible and the contract would not have been terminated. Seller complains that Buyer failed to do core drilling to assess the rock situation, and that if Buyer had done the proper investigation, the contract would not have been terminated. ("Why, on five different sites on that same ridge, that have been severely excavated both by TVA and the Department of Transportation, no one has ever found rock there.")

Mr. Tom Reddy, Real Estate Manager for Cracker Barrel Old Country Store, testified that when he presented the contract to Seller, he and Seller went over the contract for an hour or two. After the contract was signed, Reddy undertook the company's customary steps in evaluating the fitness of the proposed site. He sent documents Seller had given him about the Shoney's easement to Buyer's counsel in New Orleans. The easement situation caused him concern about ingress and egress to the property. Reddy also requested a survey and engineering studies and ordered demographic reports to estimate the overall potential for sales at that location. After he obtained this information and sent it to headquarters, Cracker Barrel terminated the contract because the information obtained showed that it would not be economically feasible to develop the site. The decision to terminate the contract was made during a conference call between Reddy and senior staff in the home office, during which they discussed the site survey and all the other engineering data.

_____

one-half acres at $100,000 per acre. It was Seller's opinion as owner of the land that, at the time of trial, the best price he could receive on a sale of the property was $20,000 per acre; therefore he had $200,200 in direct damages as a result of Buyer's breach of the contract. He also testified that he owns another 150 acres around the property at issue, all of which would have increased in value if a restaurant were built adjoining it. At least 25 of those acres would have increased in value by at least $10,000 per acre by the building of a restaurant. Therefore, Seller claimed an additional $250,000 in consequential damages. Interest at ten percent for two years would add $40,000, for a total of $490,200 damages. We express no opinion regarding the validity of seller's approach to the calculation of damages.

Reddy opined the decision was based on "the topography and the cut" i.e., the cost of cutting into the hillside, considering the cost of removal of any rock found there. He does not think anyone from Cracker Barrel ever discussed the rock problem with Seller before terminating the contract.

Mr. Mike Freeman testified that he is an Engineer Surveyor and owns Freeman Engineering Surveying. On October 18 and 24, 1996, he received faxed requests from Cracker Barrel Old Country Store to conduct a preliminary survey of two and one-half acres shown on a faxed tax map of Roane County. He performed a boundary topographical survey and provided Buyer with the results. Before doing the survey, he searched the Roane County Courthouse, the Property Assessor's Office and the Register of Deeds Office. He knew about the unrecorded judgment establishing Seller's easement over Shoney's property because he had also surveyed the adjacent property where Shoney's is located, and he had access to that survey. However, in retrospect, he now realizes that he made an error in his survey which, when corrected, would have moved the southwestern boundary line 132 feet closer to the hillside. That would mean there actually is less flat land and more hillside in Seller's property than he told Buyers. His fee for service to Buyer was $2,500, which Buyer paid.

Mr. Ted Tillman, Director of Construction for Cracker Barrel, testified that he has "personally built thirty [stores] for the company [and] supervised over a hundred." At the time that Buyer was involved with contract negotiations with this Seller, Mr. Tillman was Project Manager. His duties consisted of:

> What we would call due diligence, meaning, I would go visit the site, make an analysis, an estimate of what I perceived it would cost to develop the site. I would do what we call a D.C.E., Development Cost Estimate, and present that to Real Estate.

Mr. Tillman testified that he met with the real estate agent, discussed the site with her, received a plat to add to his folder, and visited the site. He assessed the geological conditions of the proposed site to estimate the extent of grading, excavation and fill that would be required. He saw that the adjacent property, Shoney's, had some rock outcropping coming out of the side of the mountain and "there was lots of excavation, which you would call 'cut' into the side of the hill. . . so I concluded that most likely we would have some rock excavation on the property." He prepared a development cost worksheet, a one-page estimate of preliminary figures, which originally did not include excavation of rock. That worksheet estimated that it would cost Buyer 2.651 million dollars to develop Seller's property. He then estimated that the expense of excavating rock would raise the cost by $577,000. That total, 3.2 million dollars, exceeds the maximum Cracker Barrel typically spends on development of a site. Mr. Tillman also testified that Cracker Barrel ultimately bought nearby property and built the restaurant, and that site proved to have rock which required removal.

On cross-examination, Mr. Tillman testified that his experience at estimating excavation costs in East Tennessee comes from one Cracker Barrel Restaurant which was built in

Johnson City and the restaurant in Harriman which was built on other property after this contract was terminated. The Johnson City experience "made me think that when there is a hill in East Tennessee, there's a probability that I'm going to encounter some rock." His opinion that Seller's site would involve rock excavation was also based on:

> visual inspection of the surrounding geology in Harriman, Tennessee, and reading countless soil boring reports, geotechnical soil boring reports of other projects in the, we call it the Appalachian Range of Eastern Tennessee, West Virginia, Pennsylvania, Northern Georgia, and North Carolina.

After Seller's site was rejected, Buyer purchased a nearby site and built its restaurant, with a total cost for that project of approximately $2.7 million.

Mr. Jim Torciva, Director of Real Estate for Cracker Barrel, testified that the decision to terminate Seller's contract was made in a conference call which involved himself, "Bill Sopenski, my counterpart in construction, Ted Tillman's supervisor at that time, Don Cravitts, and I think we had Tom Reddy on conference call . . . ." He said that they decided to terminate the contract under Article 6E of the contract because it was no longer feasible to proceed. The decision was made based on their feasibility studies, specifically a cost analysis which showed the cost to be estimated at 2.6 million dollars plus:

> the good possibility of an additional five or six hundred thousand dollars in rock removal, which could put the project at well over three million dollars. That would have made it not viable to continue. That was the major part of the decision not to move forward, coupled with the easement problem that was discussed earlier, or the potential for an easement problem, the unrecorded judgment. We knew that the Shoney's sign was in the easement. We also knew that their parking was in the easement.

Mr. Torciva also testified that another factor in the decision was that the demographic study done by Buyer showed that the project was not economically feasible in light of the projected sales. When asked about the 132 foot error in surveying the property, he opined that if that had been known, it would have made the project even less economically feasible. Even though the standard contract permits Cracker Barrel 90 to 180 days to notify sellers that a project will be terminated, his practice is to notify a prospective seller immediately upon the company's making a decision to terminate, so that sellers will not have their property tied up longer than necessary. For that reason, they notified Seller three weeks after entering into this contract that the contract was terminated.

On cross-examination, Torciva testified that a Cracker Barrel Restaurant was later built on nearby property in Harriman at a cost of $2.6 million. However, that site has encountered an erosion problem from the top of a hill behind the restaurant. The company is now regrading the

hill and shoring it up. Repairing that erosion problem will probably result in the overall cost of that project being near $3 million.

> The Trial Court found, as pertinent to this appeal:
>
> The defendant's decision to terminate was based on two (2) opinions: (1) the potential site development costs were too high, and (2) there were potential easement problems.
>
> In determining the site development costs the defendant sent information to an engineering firm called Design and Engineering. The engineering firm and the defendants employees determined that the site development cost would be approximately $2.65 million (Exhibit #20). The only reason the defendant found the site preparation to be excessive is based on the recommendation of Ted Tillman.
>
> Ted Tillman has been an employee of the defendant for five (5) years and serves presently as project manager and has experience in building and project management. He indicated he only had two (2) undergraduate courses in geology which he did not use. He did not indicate what his duties as project manager are or what expertise he has gained in this occupation.

The Trial Court then summarized the evidence that Design and Engineering had estimated the clearing and grading cost at $377,000 to $555,200. Those estimates, which quoted a per cubic yard cost of $9.00, assumed rock excavation. Ted Tillman's estimate, however, quoted $50 to $75 per cubic yard because of the rock. The Trial Court then stated:

> The Court finds from the evidence that Ted Tillman is not an expert in geology or in the estimating of cost of excavation. There is no objective basis to indicate there was rock nor any estimate of the amount of rock in the proposed site, other than the testimony of Ted Tillman. The Court finds the testimony of Ted Tillman concerning the cost of excavation is not credible versus a figure of Nine Dollars ($9.00) per cubic yard by an engineering firm who the defendant trusted to do its site evaluation.
>
> The Court finds that in good faith the defendant should have done the geological testing it was allowed to do under the contract and determine the cost of excavation in the area before making its decision to terminate the contract based on the cost feasibility due to excavation of rock.

On the issue of the easement, the Trial Court found:

> The defendant made no efforts to call the plaintiff or other land owners to determine if there was an actual problem. The defendant did not show documentation of the law firm's opinion and only testified of a concern or a potential of an easement problem. The Court finds that good faith required that the defendant make a reasonable effort to establish there was an actual problem before this could be used as a reason for termination.
>
>> Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement. *Restatement, 2d contracts, §205, 17 Am.Jur.2d Contract* § 256.
>>
>> Generally, in construing contracts, the courts not only look to the language of the instrument, but must ascertain, if possible, the intention of the parties, and the construction which is reasonable and fair will prevail. *Real Estate Management v. Giles, supra.* Covington v. Robinson, 723 S.W.2d 643 (Tenn.App. 1986).
>
> The Court finds from a reading of the contract, the testimony of the witnesses and the exhibits introduced that the defendant breached its covenant of good faith and fair dealing with the plaintiff in terminating the sales contract without making a reasonable effort to ascertain the amount of rock on the site and the actual cost of removal of the rock and without determining that there was an actual problem with the easement instead of a potential problem.
>
> The Court further finds that paragraph 4 of the contract provides for liquidated damages in the amount of Five Thousand Dollars ($5,000.00) if Purchaser breached the contract. The Court finds this amount to be the damages to which plaintiff is entitled under the contract.

### Discussion

Seller appeals and raises the following issue:

Whether, under the rules concerning the enforceability of liquidated damages provisions in contracts, and under facts of this case, the plaintiff's recovery of money damages should be limited to the

-9-

amount stated in the contract as liquidated damages, i.e. Five
Thousand Dollars ($5,000.).

In response, Buyer raises the following issue:

Did the Trial Court err in finding that the defendant breached its
covenant of good faith and fair dealing with the plaintiff?

Our review is de novo upon the record of the Trial Court, T. R. A. P. Rule 13(d). The
Trial Court's findings of fact are conclusive on appeal unless the evidence in the record
preponderates against those findings. *State v. Burns*, 6 S.W.3d 453 (Tenn. 1999). The interpretation
of a written agreement is a matter of law and not of fact. Therefore, as to matters of law, our scope
of review is de novo on the record with no presumption of correctness of the Trial Court's
conclusions of law. *Park Place Center Enterprises v. Park Place Mall Associates*, 836 S.W. 2d 113,
116 (Tenn. Ct. App. 1992).

Seller argues that he should not be limited to $5,000 as liquidated damages as
specified in the contract because (a) the amount of actual damages is easily determined, (b) the
liquidated damages clause acts as a penalty against the Seller, (c) Buyer withdrew the liquidated
damages funds from escrow and is therefore estopped from relying on the liquidated damages clause,
and (d) Buyer breached its implied covenant of good faith and fair dealing and therefore is liable for
actual damages.

Buyer argues that the Trial Court erred in finding that it breached the covenant of
good faith and fair dealing because that finding was based on obligations imputed to Buyer by the
Trial Court which went beyond the four corners of the contract. Buyer argues this deviation was
unwarranted because the Trial Court was obligated to interpret and enforce the contract as written,
even though it contains harsh terms.

As stated, the Trial Court held that Buyer had breached the covenant of good faith and
fair dealing and awarded Seller the liquidated damages provided for in the contract. In this appeal,
we do not reach Seller's issue of whether he "should be limited to the amount stated in the contract
as liquidated damages" unless our *de novo* review convinces us that Buyer has breached the contract.

The cardinal rule of interpretation of contracts is to ascertain the
intention of the parties and to give effect to that intention consistent
with legal principles. In construing contracts, the words expressing
the parties intentions should be given their usual, natural, and
ordinary meaning.

*Park Place Center Enterprises v. Park Place Mall Associates*, 836 S.W. 2d 113, 116 (Tenn. App.
1992).

Seller cites *Covington v. Robinson,* 723 S.W.2d 643 (Tenn. Ct. App. 1986) for the
rule that "[e]very contract imposes upon each party a duty of good faith and fair dealing in its

performance and enforcement. RESTATEMENT, 2D CONTRACTS § 205. 17 AM.JUR. 2D CONTRACTS, § 256." Our Supreme Court discussed the nature of the duty of good faith in *Wallace v. National Bank of Commerce,* 938 S.W.2d 684 (Tenn. 1997):

> In Tennessee, the common law imposes a duty of good faith in the performance of contracts. This rule has been considered in several recent decisions of the Court of Appeals. The law regarding the good faith performance of contracts was well stated by the Court of Appeals in *TSC Industries, Inc. v. Tomlin,* 743 S.W.2d 169, 173 (Tenn. App. 1987):
>
> > It is true that there is implied in every contract a duty of good faith and fair dealing in its performance and enforcement, and a person is presumed to know the law. *See* Restatement (2d) Contracts, § 205 (1979). What this duty consists of, however, depends upon the individual contract in each case. In construing contracts, courts look to the language of the instrument and to the intention of the parties, and impose a construction which is fair and reasonable.
>
> In *Covington v. Robinson,* 723 S.W.2d 643, 645-46 (Tenn. App. 1986), which was relied upon by the Court of Appeals in *TSC Industries,* the Court of Appeals held that in determining whether the parties acted in good faith in the performance of a contract, the court must judge the performance against the intent of the parties as determined by a reasonable and fair construction of the language of the instrument. In a later decision, the Court of Appeals held that good faith in performance is measured by the terms of the contract. "They [the parties] may by agreement, however, determine the standards by which the performance of obligations are to be measured." *Bank of Crockett v. Cullipher,* 752 S.W.2d 84, 91 (Tenn. App. 1988).
>
> * * *
>
> In this case . . . the language of the agreements clearly states the terms and reflects the intent of the parties . . . . *Performance of a contract according to its terms cannot be characterized as bad faith.* [Emphasis added.]
>
> * * *
>
> . . . it should be noted that the common law duty of good faith in the performance of a contract does not apply to the formation of a contract. *See* Restatement (Second) of Contracts, § 205 cmt. c (1979). Consequently, the common law duty of good faith does not

extend beyond the agreed upon terms of the contract and the reasonable contractual expectations of the parties.

*Wallace v. National Bank of Commerce*, 938 S.W.2d at 686-687, (Tenn. 1997). Applying these standards, for Seller to prove that Buyer breached the contract, Seller must show that Buyer's action in terminating the contract was not in accordance with the contract's terms. This is particularly true in this case where Buyer is an experienced commercial entity and Seller is an attorney who has been licensed to practice law in this state for over forty years.

Looking at the terms of the contract, we find that Buyer had sole discretion to determine whether its survey of the property disclosed any condition rendering the Premises unusable:

> **6.    Conditions Precedent.**
> D.      Purchaser obtaining . . . a certified survey satisfactory to Purchaser, in its sole opinion . . .  Not disclosing any condition rendering the Premises unusable, in Purchaser's sole opinion, for Purchaser's Intended Use.

The terms of the contract also gave Buyer the sole judgment as to whether the assessment studies showed that the property was satisfactory for its intended use:

> **6.    Conditions Precedent.**
> E.    Purchaser obtaining, at Purchaser's expense, boring, percolation and other soil tests ("Soil Tests") as well as environmental, structural and physical inspections/assessments ("Physical Inspections"), and feasibility, demographic, traffic pattern, labor pool and other site assessment studies ("Site Studies") showing that the Premises is satisfactory, in Purchaser's sole judgment, for Purchaser's Intended Use.

The terms of the contract also gave Buyer the sole discretion to determine whether, in Buyer's opinion, the ingress and egress to public thoroughfares was adequate:

> **6.    Conditions Precedent.**
> F.    Purchaser obtaining ingress and egress to public thoroughfares adequate, in Purchaser's sole opinion, for Purchaser's Intended Use under terms and conditions acceptable to Purchaser, in its sole discretion.

Seller was questioned at trial about whether he read the terms of the contract:

Q:      And you had an opportunity to review that, didn't you?

A:     Mr. Agee, I had the opportunity to review everything.  I thought I was dealing with honorable people, a conclusion which I have since had to adjust.

Q:     Having reviewed that, you signed it and agreed to it, didn't you?

A:     I did not review that, in particular.  I had the opportunity to. I did execute the contract by thinking I was dealing with honorable folks.

MR. AGEE:     That's all, Your Honor.

The Trial Court found that the contract implied an obligation on the part of Buyer to determine that the cost estimate of its employee, Ted Tillman, was not as credible as the competing cost estimate of Design and Engineering Company.  We find no such requirement in this contract. The Buyer was authorized to determine whether the property was suitable for its intended purpose, *in its sole judgment.*  The Trial Court had no authority to add that Buyer's "sole judgment" was valid only if the information used in making that judgment was gathered by an estimator approved by Seller.

The Trial Court found that "in good faith, the defendant should have done the geological testing it was allowed to do under the contract and determine the cost of excavation in the area before making its decision to terminate the contract based on the cost feasibility due to excavation of rock."  We find no such requirement in this contract.  The contract provides that a condition precedent is:

> E.     Purchaser obtaining, at Purchaser's expense, boring, percolation and other soil tests ("Soil Tests"), as well as e n v i r o n m e n t a l ,   s t r u c t u r a l   a n d   p h y s i c a l inspections/assessments ("Physical Inspections"), and feasibility, demographic, traffic pattern, labor pool and other site assessment studies ("Site Studies") showing that the Premises is satisfactory, in Purchaser's sole judgment, for Purchaser's Intended Use.

The Contract does not require Buyer to perform specific geological testing before it exercises its sole judgment to determine whether or not the premises are satisfactory for Buyer's intended use.  It is undisputed in the record that Buyer did make an assessment of the geological aspects of this property.  It is likewise undisputed from the testimony another factor in Buyer's decision not to proceed with the purchase was that the demographic study done by Buyer showed the project was not economically feasible in light of the projected sales.  Buyer may have been

-13-

wrong in its assessment and its exercise of its sole judgment, but whether Buyer's decision was accurate or inaccurate is immaterial to the requirements placed on Buyer by the contract.

The Trial Court found that "good faith required that the defendant make a reasonable effort to establish there was an actual [easement] problem before this could be used as a reason for termination." We find that Buyer did act in good faith in determining that the easement was a problem. The evidence shows that Seller was awarded the easement in an earlier lawsuit, but the easement had never been recorded. Shoney's had constructed a sign on the easement and was using part of the easement as a parking lot. Buyer testified that in its experience, a competing restaurant was not easy to deal with when negotiating issues such as easement rights. Once again, the contract gives Buyer the "sole discretion" to decide whether ingress and egress is acceptable to Buyer. Buyer exercised that discretion.

We find that Buyer, in terminating this contract, acted within its rights as provided by the terms of the contract. Performance of a contract according to its terms cannot be characterized as bad faith. *Wallace v. National Bank of Commerce,* 938 S.W.2d at 687, (Tenn. 1997). Accordingly, Seller is not entitled to damages for breach of the implied covenant of good faith and fair dealing. The decision of the Trial Court is reversed.

## **Conclusion**

For the reasons herein stated, the judgment of the Trial Court is reversed and this cause is remanded to the Trial Court for such further proceedings as may be required, if any, consistent with this Opinion and for collection of costs below. Costs of this appeal are assessed against Gerald Largen.